[No. 13260–1–I. Division One. July 14, 1986.]

ROBERTA TENNANT, *Individually, as Personal Representative, and as Guardian ad Litem,* ET AL, *Appellants,*
v. HARVEY C. ROYS, JR., ET AL,
*Respondents.*

*Marco DeFunis* and *DeFunis & Balint, P.S.,* for appellants.

*Barbara J. Britt* and *Gary W. House,* for respondents.

REVELLE, J.*—Roberta Tennant, as guardian ad litem for her daughter, Alisha, appeals a judgment on a jury verdict in favor of defendant Dr. Harvey C. Roys and the trial court's denial of her motion for a new trial in an action for the wrongful death of Alisha's father, Ricky Allen Roberts. We affirm.

On October 8, 1978, at 8 p.m., decedent Roberts was driving his motorcycle following a car driven by Roys. A witness of the subsequent accident who was a professional acquaintance of Roys happened to be following Roberts in another car. The street on which the three vehicles were proceeding changed from a 4–lane road to a 2–lane road, with one lane of traffic in each direction and with room for parking on both sides of the street. The accident occurred just after that change to two lanes.

The witness stated that immediately before the accident Roberts crossed the center line into the oncoming lane of traffic as if he was attempting to pass Roys' car. Then he returned to his own lane. He then apparently attempted to

---

*Judge George H. Revelle is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

pass Roys' car on the right in the parking strip, but at least three cars were parked beside the curb and obstructed his way. He braked and skidded sideways onto the pavement. He then hit both Roys' car and the northernmost of the three parked cars. The witness also stated that Roys was driving normally.

Roys testified that he had been driving straight ahead and had not been swerving to the right or to the left. He said that he was unaware of the motorcyclist until he heard a sound resembling a tire "blowout." After hearing that noise, Roys pulled to the side of the road and discovered Roberts lying in the street beside the motorcycle. He stated that he discovered a small scratch on the right rear fender of his car and a small piece of chrome pulled off on the right side of the car. He also testified that one of the cars by the curb had a long scratch on the side of the car.

A person who lived adjacent to the scene of the accident testified that she observed a motorcycle skid mark paralleling the parked car and also observed scratch marks at motorcycle handlebar height on two other parked cars up the street from the scene of the accident. She also testified that Roberts had been carrying a six–pack of beer, one of which was opened, and that he smelled of liquor.

After the accident, Roberts was taken to Harborview Medical Center where a blood alcohol test was administered by a laboratory assistant and recorded as ETOH–146 (ethyl alcohol). The supervising chemist of the toxicology department at Harborview testified that the blood alcohol test administered on Roberts was the same as blood test results used in criminal DWI cases, except for an absence of a second confirming test. The trial court, over plaintiff's objection, admitted the results of the blood alcohol analysis test into evidence. It read 146. The chemist testified that this reading was the equivalent to a reading of .11 to .12 percent obtained from "a whole blood sample" test or a Breathalyzer test. In addition, the chemist testified that this level would cause any individual's normal driving ability to be reduced 20 to 33 percent.

At trial, Tennant presented the testimony of an accident reconstructionist who stated that the account of the accident given by the defense witness didn't correspond with the physical evidence. He noted particularly that the handlebar height scratches on Roys' vehicle, the scratches on the parked cars and the indentation on Roys' car fender indicated that Roys' vehicle had moved to the right and sandwiched Roberts' motorcycle upright between Roys' vehicle and parked cars. The reconstructionist noted that this evidence was contrary to the witness' description of the accident in which she testified that Roberts' motorcycle was falling down when it hit Roys' car. He also testified that the motorcycle could not have hit Roys' car while passing it because the force on the handlebars would have turned the motorcycle into Roys' car causing it to slide under Roys' car before subsequently hitting the parked car.

The trial court also permitted, over Tennant's objection, Roys' counsel to label the decedent a "drunk driver" during the opening statement. However, the trial court sustained Tennant's objection to Roys' reference to Roberts' blood alcohol level and instructed the jury to disregard the remark. The jury found for Roys. Tennant's motion for a new trial was denied. She now appeals.

## JURY INSTRUCTIONS

Tennant maintains the trial court erred by giving certain jury instructions and by failing to give others. Instructions are sufficient if they permit each party to argue his theory of the case, are not misleading, and when read as a whole they properly inform the jury of the applicable law. *Tiderman v. Fleetwood Homes*, 102 Wn.2d 334, 337–38, 684 P.2d 1302 (1984). The number of instructions necessary to present a theory of a case is within the trial court's discretion. *Young v. Carter*, 38 Wn. App. 147, 149–50, 684 P.2d 784 (1984).

Tennant first assigns error to the court's refusal to give her proposed jury instruction 6A based on RCW 46.61-.608(1) which stated that all motorcycles are entitled to full

use of a lane and no motor vehicle shall be driven in such a manner as to deprive any motorcycle of the full use of the lane.[1] She argues that the crack in the pavement running in the direction of travel is the equivalent of a lane divider.

The trial court did not abuse its discretion when it failed to give Tennant's proposed instruction 6A. Tennant could have adequately presented her theory that Roys negligently moved to the right of his own lane without warning, struck the motorcycle and sandwiched it between Roys' vehicle and the parked cars through instruction 6 based on WPI 10.01 regarding negligence, instruction 7 based on WPI 10.02 regarding ordinary care, and instruction 13 based on WPI 70.06 regarding the right to assume others will obey the law on the streets and highways. In addition, proposed instruction 6A would have misled the jury since the motorcycle was not in its marked lane when the accident occurred, but was in a lane first occupied by Roys' car. Finally, RCW 46.61.608(1) reflected in proposed instruction 6A is irrelevant to this overtaking situation. Instead, the provisions of RCW 46.61.608(2) and (3) concerning overtaking, passing between adjacent lines or rows of vehicles are relevant to the facts in this case and were properly given here in instructions 16 and 17. Thus, the court properly refused to give proposed instruction 6A since it was not supported by substantial evidence. *Minert v. Harsco Corp.*, 26 Wn. App. 867, 873, 614 P.2d 686 (1980).

 Error is also assigned to the court's refusal to give

---

[1]RCW 46.61.608 provides:

"(1) All motorcycles are entitled to full use of a lane and no motor vehicle shall be driven in such a manner as to deprive any motorcycle of the full use of a lane. This subsection shall not apply to motorcycles operated two abreast in a single lane.

"(2) The operator of a motorcycle shall not overtake and pass in the same lane occupied by the vehicle being overtaken.

"(3) No person shall operate a motorcycle between lanes of traffic or between adjacent lines or rows of vehicles.

"(4) Motorcycles shall not be operated more than two abreast in a single lane.

"(5) Subsections (2) and (3) of this section shall not apply to police officers in the performance of their official duties."

Tennant's proposed jury instruction 6B based on RCW
46.61.305(1) which stated that no person shall turn a vehi-
cle or move right or left on a roadway unless he gives an
appropriate signal prior to moving and that movement can
be made with reasonable safety. The evidence does not
support proposed instruction 6B. One is not required to
give a signal in advance in order to move his vehicle within
his same lane unless he intends to change lanes. Since a
crack in the pavement does not define a lane, any move-
ment which Roys may have made did not require signaling
from side to side. The court is not required to give an
instruction which is erroneous in any respect, *Crossen v.
Skagit Cy.*, 100 Wn.2d 355, 360–61, 669 P.2d 1244 (1983),
or where it is reasonably possible to misstate the law.
*Tiderman*, at 337–38.

Finally, error is assigned to the trial court's giving
instructions 12 and 15. Instruction 12, based on WPI 70.04
regarding the following car doctrine, correctly stated Rob-
erts' duty. *See Enslow v. Helmcke*, 26 Wn. App. 101, 104–
05, 611 P.2d 1338 (1980). It is uncontroverted that Roberts
was following Roys before he made his decision to illegally
pass Roys in the parking strip. Thus, because the instruc-
tion was based on sufficient evidence and correctly stated
the law applicable to this case, the court did not err in giv-
ing that instruction.[2] *Minert*, at 873.

Tennant next assigns error to the court's giving
instruction 15, based on WPI 12.01 regarding voluntary
consumption of alcohol. However, Tennant cites no author-
ity to support her position. Contentions unsupported by
citation of authority need not be considered on appeal. *Top
Line Equip. Co. v. National Auction Serv., Inc.*, 32 Wn.
App. 685, 692, 649 P.2d 165 (1982). Nevertheless, her con-

---

[2]Plaintiff relies on *Ashcraft v. Wallingford*, 17 Wn. App. 853, 856, 565 P.2d
1224 (1977) regarding use of the following car doctrine in jury instructions. That
case is distinguishable. There defendant was overtaking a vehicle in the passing
lane, whereas in this case the decedent was not even passing in a legally marked
separate lane. In addition, the case does not discuss the appropriateness of a fol-
lowing car instruction.

tention that instruction 15 was not based on any competent evidence is unsubstantiated by the record. Even assuming that the expert's testimony regarding Roberts' intoxication was inappropriate, a witness also testified, unchallenged, that Roberts had been carrying a six–pack of beer, one was open and that Roberts smelled of alcohol. This is enough evidence to support instruction 15. *Minert,* at 873. Thus, there was no error.

## EVIDENCE

■ Tennant next assigns error to the court's allowing a state toxicologist to testify that the results of Roberts' blood alcohol test indicated a loss of driving ability from 20 to 33 percent depending upon individual tolerance. Admission of an expert's conclusions under ER 703 is within the broad discretion of the trial court. *State v. Ecklund,* 30 Wn. App. 313, 317–18, 633 P.2d 933 (1981). An expert may testify in the form of opinions "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue". ER 702; *State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984). The facts or data on which the expert bases his opinion may be of a type reasonably relied upon by experts in the particular field. These facts or data need not be themselves admissible as evidence. ER 703.

Here, the trial court did not abuse its discretion by admitting the evidence regarding loss of driving ability because (1) foundation evidence established that the witness qualified as an expert; (2) his opinion was based on a test generally accepted in the scientific community; and, (3) his testimony was helpful to explain Roberts' actions. That these tests have gained general acceptance in the scientific community is obvious from the record which shows that hospitals rely on these tests before they operate and that these tests are the same used by the State in its prosecutions for driving while intoxicated (DWI). The fact that an expert's opinion is based upon the results of laboratory tests performed by an assistant working under the expert's

supervisor does not affect its admissibility. *Ecklund,* at 317–19.

Tennant also assigns error to the admission of the hospital records showing that Roberts had the equivalent of a blood alcohol reading of between .11 and .12 percent relevant to a DWI charge. Hospital records are normally admissible as an exception to the hearsay bar in order to show events, conditions, or acts under the Uniform Business Records as Evidence Act (UBRA), RCW 5.45.020, unless the records are otherwise inadmissible evidence such as expressions of opinion, conjecture or speculation. *Young v. Liddington,* 50 Wn.2d 78, 83–84, 309 P.2d 761 (1957); *Bradley v. Maurer,* 17 Wn. App. 24, 30, 560 P.2d 719 (1977). Medical tests are presumed to be particularly trustworthy because the hospital relies on its staff members to competently perform their duties when making often crucial life and death decisions. In addition, the UBRA contains five requirements for admissibility designed to ensure reliability. Evidence must be in record form; must be an act, condition, or statement; must be made in the regular course of business; must be made at or near the time of the act, condition or event; and finally the court must be satisfied that sources of information, method, and time of preparation justify the admittance of the evidence. *State v. Kreck,* 86 Wn.2d 112, 118, 542 P.2d 782 (1975). All these requirements are met here. Thus, the problems inherent in hearsay are overcome and the test results were properly admitted.

Tennant also argues that the blood alcohol analysis test result is precluded by RCW 46.61.506 and WAC 448–14–020 because a second test was not given. Former RCW 46.61.506 states

> Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a vehicle while under the influence of intoxicating liquor . . .
>
> . . .

(3) Chemical analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502[3] or 46.61.504[4] shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose. The state toxicologist is directed to approve satisfactory techniques or methods, to supervise the examination of individuals to ascertain their qualifications, and competence to conduct such analyses . . .

WAC 448-14-020(1)(a), the state toxicologist standards for analyses of blood samples for alcohol, states that an "analytical procedure *should* include: . . . (iii) [d]uplicate analyses that should agree to within [plus or minus] 0.01% blood alcohol deviation from the mean." (Italics ours.)

Roys claims that this double test requirement relates only to negligence per se under RCW 46.61.502 and 46.61-.504 mentioned in RCW 46.61.506 and to criminal proceedings. The trial court concluded that the ambiguity was an indication that the Legislature has left the admissibility of such evidence up to the discretion of the court and that Tennant had sufficient redress through cross examination on the issue.

■■ We hold that WAC 448-14-020 does not bar admissibility of a blood alcohol analysis test when a second confirming test is not performed because the term "should" is directional and is not mandatory as is the term "shall" in this statute. Where a provision contains both the words "shall" and "may", it is presumed that lawmakers intended to distinguish between them; "shall" being construed as mandatory and "may" being construed as permissible. *Scannell v. Seattle*, 97 Wn.2d 701, 704-05, 648 P.2d 435,

---

[3]A person is guilty of driving while under the influence of intoxicating liquor when he has a .10 percent or more by weight of alcohol in his blood as shown by chemical analysis of his blood made under RCW 46.61.506.

[4]A person is guilty of being in actual physical control of the motor vehicle while under the influence of intoxicating liquor when he has a .10 percent or more by weight of alcohol in his blood as shown by chemical analysis of his blood made under RCW 46.61.506.

656 P.2d 1083 (1982).

Similarly, when both "shall" and "should" appear in the same statute, as in WAC 448–14–020, it is presumed that the state toxicologist[5] meant the terms to be distinguished. "Should" is not defined in the statute, thus it must be given its common meaning unless contrary intent appears. *State ex rel. Nugent v. Lewis*, 93 Wn.2d 80, 82, 605 P.2d 1265 (1980). Courts frequently go to dictionaries to ascertain the common meaning of statutory terms. *Intermediate Sch. Dist. 105 v. Yakima Cy.*, 81 Wn.2d 443, 445, 503 P.2d 104 (1972). Among the meanings of "should" noted in *Webster's Third New International Dictionary* 2104 (1976) are to express a condition, propriety expediency, and a desire or request in a polite or unemphatic manner or to tone down a direct blunt statement. We hold that the Legislature under WAC 448–14–020 was stating that duplicate test procedure was expedient, fit, proper and advisable and that it had a strong desire that two tests be done, but that a second test was not mandatory.

This position is also consistent with Washington cases which hold that failing to strictly follow a Breathalyzer procedure is not necessarily prejudicial and does not necessarily preclude admittance of the evidence. *Seattle v. Rainwater*, 86 Wn.2d 567, 570–71, 546 P.2d 450 (1976). Any challenge to the reliability goes to the weight rather than the admissibility of the test which can be addressed in the cross examination. *State v. Peterson*, 100 Wn.2d 788, 792, 674 P.2d 1251 (1984).[6]

---

[5]WAC 448–14 was adopted to reflect the legislative intent of RCW 46.61.506 pursuant to RCW 34.04.

[6]It may be noted that in other jurisdictions, statutory requirements regarding blood alcohol analysis tests have generally been held not to apply to civil cases because only a criminal defendant is entitled to certain procedural safeguards before a statutory presumption of being drunk is applied. *McAlpine v. Midline Elec. Co.*, __ Mont. __, 634 P.2d 1166 (1981). *Bach v. Penn Cent. Transp. Co.*, 502 F.2d 1117, 1120 (6th Cir. 1974). In a civil context, testimony tending to show that the decedent had been drinking before the fatal accident generally is admitted in regard to the contributory negligence issue. *Bach*, at 1121.

In summary, the trial court did not err in admitting the results of blood alcohol tests because the statutory procedure did not preclude the admittance of the evidence of the UBRA, because hospital tests are presumed reliable and are generally admissible when relevant under the UBRA when they concern a party's condition as they do here, and because WAC 448–14–020 is directive and not mandatory so the lack of the second test does not bar admissibility.

### OPENING STATEMENT

Tennant assigns error to the trial court's allowing Roys' counsel to label Roberts as a "drunk driver" and refer to his blood alcohol level in his opening statement, even though this allegation was based on admissible evidence. First, the appellant does not cite authority that it was an error to label Roberts as a "drunk driver". Contentions without the support of authorities need not be considered on appeal. *Top Line,* at 692.

However, even if this were not the case, the trial court did not err in allowing Roys to make the "drunk driver" statement. An opening statement sets forth what issues will be presented and what a party proposes to prove in support of his cause of action. 2 L. Orland, Wash. Prac., *Trial Practice* § 212, at 232 (3d ed. 1972). It merely is a statement of facts expected to be proved. Orland, at 233. Since Roys expected to and did present evidence that Roberts was drunk, he could therefore properly tell that to the jury in his opening statement.

Lastly, Tennant contends that she is entitled to a mistrial because the defense referred to Roberts' actual blood alcohol level in the opening statement. He claims that the prejudicial effect of the comment could not be removed from the jury's consideration by the court's instruction.

However, the court after sustaining Tennant's objection to the statement instructed the jury to disregard the comment. A jury is presumed to follow jury instructions and that presumption will prevail until it is overcome by a showing otherwise. *Metropolitan Seattle v. Kenmore Prop-*

*erties, Inc.,* 67 Wn.2d 923, 930–31, 410 P.2d 790 (1966). No such showing was made here. The trial court did not therefore err in denying Tennant's motion for mistrial.

Affirmed.

SWANSON and COLEMAN, JJ., concur.